**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACQUES ARSENAULT, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BITGO HOLDINGS, INC., MICHAEL A. BELSHE, EDWARD REGINELLI, CHEN FANG, BRIAN BROOKS, JUSTIN EVANS, BRIAN MURRAY, SUNITA PARASURAMAN, and VIVEK PATTIPATI, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Jacques Arsenault ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BitGo Holdings, Inc. ("BitGo" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class (the "Class") consisting of all persons and entities other than Defendants that purchased or otherwise acquired (a) BitGo Class A common stock pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's January 22, 2026 initial public offering (the "IPO" or "Offering"); and/or (b) BitGo securities between January 22, 2025 and May 13, 2026, both dates inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      BitGo operates as a digital asset infrastructure company, offering a platform on which its customers may store, trade, and stake digital assets.  The Company reports its revenue in segments including, as relevant here, Digital Asset Sales, which is derived from the total value of trading volume of digital asset trades during the relevant reporting period, and Staking, which is primarily comprised of revenues associated with rewards issued by a relevant blockchain protocol, typically in form of the blockchain network's digital asset.

3.      On September 19, 2026, BitGo filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on January 21, 2026 (the "Registration Statement").

4.      On January 22, 2026, BitGo conducted the IPO, selling 11,821,595 million shares of its Class A common stock to the public at the initial offering price of $18.00 per share for proceeds of over $187.58 million to the Company, before expenses, and after applicable underwriting discounts and commissions.

5.      On January 23, 2026, BitGo filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

6.      The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants understated the scope and severity of the risk that declining digital asset prices posed to Company's business and financial performance; (ii) consequently, Defendants' statements regarding, *inter alia*, BitGo's financial performance and business prospects as a public company lacked a reasonable basis; and (iii) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and/or failed to state information required to be stated therein.

7.      On March 26, 2026, BitGo issued a press release announcing its fourth quarter and full year 2025 financial results.  Among other items, BitGo reported a net loss of $14.8 million for 2025, compared to $156.6 million in net income for 2024, a quarterly margin of 0.21% in its Digital Asset Sales segment, compared to a quarterly margin of 0.47% in the prior year, and declined to offer specific revenue guidance for the first quarter of 2025.  BitGo stated that the change in its annual net loss was "materially driven by declines in digital asset prices impacting the Company's Bitcoin treasury."  Defendants also declined to provide explicit guidance for the first fiscal quarter of 2026, even though the quarter would end just five days later.  Instead, Defendants merely

provided general commentary to the effect that BitGo's revenue streams faced "a direct impact" from a "challenging" macroeconomic environment.

8.     On this news, BitGo's stock price fell $1.43 per share, or 15.71%, to close at $7.67 per share on March 27, 2026.

9.     Then, on May 13, 2026, BitGo issued a press release announcing its business and financial results for the first fiscal quarter of 2026.  Among other items, BitGo reported a net loss of $60.7 million, compared to a net loss of $25.7 million in the same quarter one year earlier. BitGo stated that its quarterly net loss "reflect[ed] weaker market conditions, approximately $3.0 million of one-time legal and professional costs associated with the IPO and other strategic initiatives, and continued investment in product, platform, and go-to-market capabilities".

10.     On this news, BitGo's stock price fell $2.05 per share, or 17.2%, to close at $9.86 on May 14, 2026.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Per BitGo's most recent quarterly financial statements filed with the SEC on Form 10-Q, as of May 7, 2026, there were more than 107 million shares of the Company's publicly traded Class A common stock outstanding.  Accordingly, there are presumably hundreds, if not thousands, if not thousands, of investors in BitGo Class A common stock located in the U.S., some of whom undoubtedly reside in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

16.     Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired shares of BitGo Class A common stock pursuant and/or traceable to the Offering Documents issued in connection with the IPO and/or BitGo securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant BitGo is a Delaware corporation with principal executive offices located at 101 S. Reid Street, Suite 307, PMB# 9793, Sioux Falls, South Dakota, 57108.  BitGo's Class A stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "BTGO".

18.     Defendant Michael A. Belshe ("Belshe"), BitGo's Co-Founder, served as BitGo's Chief Executive Officer, Chief Technology Officer, and President at all relevant times.  Defendant Belshe also serves on the Company's Board of Directors.

19.     Defendant Edward Reginelli ("Reginelli") served as BitGo's Chief Financial Officer at all relevant times.

20.     Defendants Belshe and Reginelli are collectively referred to herein as the "Exchaneg Act Individual Defendants".

21.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of BitGo's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of BitGo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with BitGo, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     BitGo and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants".

23.     Defendant Chen Fang ("Fang") served as BitGo's Chief Revenue Officer at all relevant times.  Defendant Fang also serves on the Company's Board of Directors.

24.     Defendant Brian Brooks ("Brooks") served as a Director of BitGo at all relevant times.

25.     Defendant Justin Evans ("Evans") served as a Director of BitGo at all relevant times.

6

26.    Defendant Brian Murray ("Murray") served as a Director of BitGo at all relevant times.

27.    Defendant Sunita Parasuraman ("Parasuraman") served as a Director of BitGo at all relevant times.

28.    Defendant Vivek Pattipati ("Pattipati") served as a Director of BitGo at all relevant times.

29.    Defendants Belshe, Reginelli, Fang, Brooks, Evans, Murray, Parasuraman and Pattipati are sometimes referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed or authorized the signing of the Registration Statement filed with the SEC.

30.    As directors, executive officers, and/or major shareholders of the Company, the Individual Defendants participated in the solicitation and sale of BitGo common stock in the IPO for their own benefit and the benefit of the Company.  The Individual Defendants were key members of the IPO working group and executives of the Company who pitched investors to purchase the shares sold in the IPO.

31.    BitGo and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

32.    BitGo operates as a digital asset infrastructure company, offering a platform on which its customers may store, trade, and stake digital assets.  The Company reports its revenue in segments including, as relevant here, Digital Asset Sales, which is derived from the total value of trading volume of digital asset trades during the relevant reporting period and Staking, which is

7

primarily comprised of revenues associated with rewards issued by a relevant blockchain protocol, typically in form of the blockchain network's digital asset.

33.     On September 19, 2026, BitGo filed a Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on January 21, 2026.

34.     On January 22, 2026, BitGo conducted the IPO, selling 11,821,595 million shares of its Class A common stock to the public at the initial offering price of $18.00 per share for proceeds of over $187.58 million to the Company, before expenses, and after applicable underwriting discounts and commissions.

35.     On January 23, 2026, BitGo filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

**<u>Materially False and Misleading Statements Issued in the Offering Documents</u>**

36.     The Offering Documents included a letter from Defendant Belshe, in which he stated, *inter alia*:

> We believe that everything will be a digital asset.  Today's digital asset market is a mere $4 trillion.  As [risk-weighted assets] take foot, ***we believe that trillions more will move into the digital realm.  BitGo's job is to enable and accelerate this transition***.[1]

37.     The Offering Documents reaffirmed Defendant Belshe's view of digital assets, both as to their ubiquitous future and the monetary value they would represent, stating *inter alia*:

> ***We believe most assets will eventually be digital or have a digital representation***. There is the potential for new forms of value to be created, while traditional physical asset classes such as real estate and gold can be digitized.  This shift would fundamentally revolutionize our global financial system. . . . ***We believe the value of these digital assets could eventually represent a multi-trillion dollar opportunity and may match or exceed the current values of physical assets***.

---

[1] All emphases herein added unless otherwise stated.

8

38.     The Offering Documents attempted to assure investors that BitGo's business and financial performance would remain positive despite "the volatility in digital asset price cycles and corresponding fluctuations in our historical results," stating *inter alia*:

> ***Despite the volatility in digital asset price cycles and corresponding fluctuations in our historical results, we have continued to prioritize growth through consistent investment in our platform, people and client service*** because of our belief in the long-term benefits of the digital asset ecosystem and our belief that greater scale would increase our ability to best serve our clients.  We believe this sustained prioritization and investment has made us a leading company in the digital asset economy.

39.     The Offering Documents made a similar attempt to assure investors when discussing the Company's metric "assets on platform", which the Offering Documents described as a "key measure of the fundamental health, direction, and monetization opportunity of our platform", stating *inter alia*:

> We define Assets on Platform ("AoP") as the median of the daily balances of total assets on our platform over the measured period, where daily balances represent the fair value of both fiat currency and digital assets, whether custodied or non-custodied, held by clients in their accounts on our platform at the end of each day, calculated based on the market price of the applicable assets at the end of such day. . . .  We view AoP as a key measure of the fundamental health, direction and monetization opportunity of our platform.  AoP also has a correlation with our total revenues as we earn revenues from the suite of products and services we provide in connection with the balances held by our clients on our platform. . . .  ***Despite short term fluctuations due, in part, to fluctuations in the digital asset economy and corresponding fluctuations in the prices of digital assets, our AoP has generally increased over time, reaching $17.0 billion, $30.8 billion and $90.0 billion for the quarters ended December 31, 2022, 2023, and 2024, respectively, and reaching a new peak of $104.0 billion for the quarter ended September 30, 2025***.

40.     The Offering Documents provided investors preliminary estimated results for the end of the fiscal year ended December 31, 2025, which included an "expected increase" in total revenue, "primarily driven by estimated increases in each of the components of total revenue".  As to the Digital Asset Sales segment, Defendants estimated revenue between approximately $15.475.

billion and approximately $15.522 billion, and costs between approximately $15.441 billion and approximately $15.487 billion, stating *inter alia*:

> We estimate digital assets sales revenue to range from $15,475.7 million to $15,522.3 million for the year ended December 31, 2025, representing an increase of $12,956.0 million (using the midpoint of the range), when compared to $2,543.0 million for the year ended December 31, 2024. The expected increase is primarily attributable to higher digital asset trading activity resulting from the expansion of trading pairs on the platform, increased activity from existing clients, and an expanding client base. . . .  For the year ended December 31, 2025, we estimate digital assets sales costs to range from $15,441.1 million to $15,487.6 million, representing an increase of $12,933.3 million (using the midpoint of the range), when compared to $2,531.1 million for the year ended December 31, 2024.

41.     As to net income, the Offering Documents included Defendants' estimation that net income from operations would fall between approximately $3.15 million and $3.52 million, stating *inter alia*:

> We estimate profit from operations to range from $3.2 million to $3.5 million for the year ended December 31, 2025, representing an increase of $10.3 million (using the midpoint of the range) when compared to $7.0 million loss from operation for the year ended December 31, 2024. The expected increase is driven by the factors driving the changes in total revenues and total expenses described above.

42.     Even as they purported to caution investors of the volatility of digital asset values, the Offering Documents projected confidence as to BitGo's performance in spite of the possibility that digital asset prices would fluctuate, asserting that "the fundamentals of [BitGo's] business continue to be strong and resilient over time", and that these fundamentals "resulted in trading activity on [BitGo's] platform progressively increasing since our inception" stating *inter alia*:

> Our core business revolves around providing custody, security, and trading and infrastructure solutions for a range of digital assets.  Accordingly, our business correlates to trends in the broader digital assets market, including client sentiment and macroeconomic ongoings.  These factors largely impact price and volatility of digital assets, which underlie the foundation of our business model.  Significant price increases or declines in digital assets can substantially influence the value of the assets on our platform, directly impacting our revenue due to our percentage-based fee model.  . . .  ***While we have experienced fluctuations in our business related to these pricing and volatility uncertainties, we believe that the***

*fundamentals of our business continue to be strong and resilient over time*, which has resulted in trading activity on our platform progressively increasing since our inception.

These consistent reassurances in the Offering Documents as to the purportedly "strong and resilient" "fundamentals of [BitGo's] business" effective negated any cautionary language about the volatility of digital prices.

43.    The statements referenced in ¶¶ 36–42 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.    Specifically, the Offering Documents failed to disclose that: (i) Defendants understated the scope and severity of the risk that declining digital asset prices posed to Company's business and financial performance; (ii) consequently, Defendants' statements regarding, *inter alia*, BitGo's financial performance and business prospects as a public company lacked a reasonable basis; and (iii) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

**Materially False and Misleading Statements Issued During the Class Period**

44.    The Class Period begins on January 22, 2026, when BitGo's common stock began publicly trading on the NYSE pursuant to the materially false and misleading statements or omissions contained in the Offering Documents, as referenced in ¶¶ 36–42, *supra*, which related to the scope and severity of the risk that declining digital asset prices presented to BitGo's business and financial performance.

45.     On January 22, 2026, BitGo issued a press release entitled "BitGo Holdings Celebrates its Debut as a Public Company on the New York Stock Exchange". This press release quoted Defendant Belshe expressing confidence in BitGo's financial prospects, stating *inter alia*:

> "Today marks a defining moment for BitGo," said Mike Belshe, CEO and Co-Founder of BitGo. "Our entry into the public markets will enable us to further accelerate the financial system's transition toward a transparent and credible digital asset economy, while continuing to deliver exceptional security, custody and liquidity solutions for our clients. ***We believe that the opportunity ahead is significant and that we are uniquely positioned to help institutions navigate the road ahead***."

46.     On January 29, 2026, BitGo issued a press release announcing receipt of final approval to operate as a national trust bank from the Office of Comptroller of the Currency, an independent bureau of the U.S. Department of the Treasury that charters, regulates, and supervises all national banks and federal savings associations. This press release also quoted Defendant Belshe expressing confidence about BitGo's financial prospects and the future of digital assets generally, stating *inter alia*:

> "Becoming a public company and a federally chartered national trust bank represents the culmination of more than a decade of building regulated, institutional-grade digital asset infrastructure," said Mike Belshe, Chief Executive Officer of BitGo. "***This is not just a milestone for BitGo, it is a milestone for the industry. Digital assets are entering a new era where trust, regulation, and resilience are foundational, and BitGo is proud to help set that standard***."

47.     On February 12, 2026, BitGo issued a press release announcing a "significant expansion" of its partnership with 21shares, purportedly "one of the world's largest issues of cryptocurrency exchange traded products". In this press release, BitGo claimed its expanded partnership with 21shares "follows continued momentum" at the Company, referencing its IPO and approval to act as a national trust bank, stating *inter alia*:

> BitGo Holdings, Inc. . . . and 21shares, one of the world's largest issuers of cryptocurrency exchange traded products (ETPs), today announced a significant expansion of their partnership across the United States and EMEA. . . . ***This***

*expansion follows continued momentum at BitGo*, including receiving approval from the Office of the Comptroller of the Currency (OCC) to convert its subsidiary, BitGo Bank & Trust, to a federally chartered trust bank for digital assets and its recent IPO on the New York Stock Exchange, *further enhancing BitGo's ability to serve institutional partners with strong governance, regulatory alignment, and operational resilience*.

48.     On March 5, 2026, BitGo issued a press release announcing that its subsidiary would provide stablecoin infrastructure services and support distribution for SoFi Bank N.A.  This press release quoted Defendant Belshe as stating BitGo boasted a "longstanding foundation of trust", stating *inter alia*:

> "Our Stablecoin-as-a-Service offering was designed for forward-thinking institutions that require cutting-edge technology paired with BitGo's longstanding foundation of trust," said Mike Belshe, CEO and Co-founder of BitGo.

49.     The statements referenced in ¶¶ 45–48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, the Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants understated the scope and severity of the risk that declining digital asset prices posed to Company's business and financial performance; (ii) consequently, Defendants' statements regarding, *inter alia*, BitGo's financial performance and business prospects lacked a reasonable basis; and (iii) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and/or failed to state information required to be stated therein.

## The Truth Begins to Emerge

50.     On March 26, 2026, BitGo filed with the SEC an annual report on Form 10-K (the "Form 10-K"), reporting its fourth quarter and full year 2025 financial results, and issued a press release announcing the same.  Among other items, BitGo reported a net loss of $14.8 million for 2025, compared to $156.6 million in net income for 2024, stating that "the change [was] materially

13

driven by declines in digital asset prices impacting the Company's Bitcoin treasury." BitGo also reported a margin of 0.21% in its Digital Asset Sales segment, less than half of the corresponding 0.47% margin BitGo reported for the fourth quarter of the prior year.

51.    Also on March 26, 2026, during a conference call Defendants held to discuss the financial results detailed in the Form 10-K (the "FY 2025 Earnings Call"), Defendant Reginelli stated that several disappointing aspects of BitGo's financial results reported that day were caused by declining digital asset prices, including the Company's revenue from its Staking segment, stating *inter alia*:

> Moving on to our results. Fourth quarter total revenue of $6.2 billion increased 440% year-over-year. For the full year, total revenue of $16.2 billion increased 424% year-over-year. . . . ***This growth was partially offset by a decline in staking revenue due to lower digital asset prices***. . . . Assets on platform of $81.6 billion decreased 9% year-over-year, while assets staked of $15.6 billion decreased 51% year-over-year. ***These declines were driven by lower digital asset prices***. . . . In the fourth quarter, digital asset sales costs were $6.0 billion, resulting in a take rate of roughly 24 basis points. For the full year 2025, digital asset sales costs were $15.5 billion with a take rate of approximately 21 basis points. Staking revenue in the fourth quarter of $58.3 million declined roughly 64% year-over-year. Full year staking revenue of $385.0 million decreased 16% year-over-year. ***Decreases across both periods were primarily driven by volatility in digital asset prices.*** Similar to digital asset sales, staking revenue includes corresponding fees.

52.    Defendant Reginelli similarly attributed BitGo's net loss for both the fourth quarter and full fiscal year 2025 to declining digital asset prices, stating *inter alia*:

> Net loss in the fourth quarter was $50 million compared to a net income of $129.4 million in the prior year. Net loss for the full year was $14.8 million compared to net income of $156.5 million in the prior year. ***Losses in both periods were primarily driven by unrealized losses on the company's digital asset treasury due to falling digital asset prices***.

53.    Finally, Defendants declined to provide explicit guidance for the first fiscal quarter of 2026, even though it would end just five days later. Instead, during the FY 2025 Earnings Call Defendants merely provided general commentary to the effect that BitGo's revenue streams faced

14

"a direct impact" from a "challenging" macroeconomic environment.  Specifically, Defendant Reginelli previewed that BitGo had been operating under "challenging" conditions that "have carried into the first quarter", again referencing "pressure" on digital asset prices and stating *inter alia*:

> Now turning to expectations for the first quarter of 2026.  We've been operating as a publicly listed company for about 10 weeks.  And while the quarter is not complete yet, we want to be transparent and share insights into the current market conditions.  ***The macro environment in the fourth quarter was challenging, and those conditions have carried into the first quarter***.  ***Digital asset prices have remained under pressure*** and geopolitical tensions in the Middle East have added additional volatility.  ***These macro conditions, along with the decline in digital asset prices have a direct impact on our revenue streams***.  ***We are not immune to these dynamics***.

54.     On this news, BitGo's stock price fell $1.43 per share, or 15.71%, to close at $7.67 per share on March 27, 2026.

55.     Several analysts recalibrated their expectations for BitGo's performance going forward in the wake of BitGo's net loss for the quarter, its underperformance in its Digital Asset Sales segment, and Defendants' decision not to issue guidance for the first quarter of 2025.  For example, on March 27, 2026, Deutsche Bank reduced its price target 12.5%, from $16 to $14, noting "***lower than expected net digital asset trading (due to lower trading margin, at 24bps vs. our 27bps estimate) drove the total net revenue miss vs. expectation (2% below our est. and Consensus)***".  On March 26, 2026, Goldman Sachs reduced its price target approximately 4.5%, from $11 to $10.50, citing "***12% lower digital asset sales net revenue***" during the quarter and Defendants' expectation that net staking revenue would "decline sequentially, and decline significantly YoY." On March 27, 2026, Compass Point reduced its price target 6.25%, from $16 to $15, noting that "***management did not provide explicit 1Q guidance but instead provided extremely broad 1Q commentary.  Limited 1Q visibility could weigh on near-term sentiment***,

15

and we reduce our 2026 forecasts (PT ~$1 to $16) to reflect a more prolonged crypto winter." On March 27, 2026, Rosenblatt similarly reduced its price target 11.8%, from $17 to $15, citing "market conditions" and noting that even as Defendants opted not to give specific guidance for the first quarter, they "*indicated revenue would be down Q/Q with market-related weakness in trading* and staking plus lower distribution fees within the less-market sensitive Subscriptions and Services revenue." Rosenblatt further noted that BitGo's quarterly net revenue digital asset sales of $14.3 million "missed our $16.7M estimate despite strong gross trading volumes (~$6.0B), *reflecting continued pressure from low take rates (~24bps)*", rather than declining digital asset prices. On March 31, 2026, Mizuho lowered its price target 17.6%, from $17 to $14, stating BitGo "would have been profitable in Q4, but *reported a ~$50mn net loss due to unrealized losses on its digital-asset treasury*", and cited "the softer backdrop for crypto (BTC down ~50% from ATH), *net revenue decreasing ~20% for 26/27*" as rationale for lowering its price target.

56.     Notwithstanding the foregoing disclosures and resulting drop in BitGo's share price, BitGo's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about the scope and severity of the risk that declining digital asset prices presented to BitGo's business and financial performance, the risk that BitGo's Digital Asset Sales segment would suffer from low margins, and BitGo's post-IPO financial prospects.

57.     For example, during the FY 2025 Earnings Call, Defendant Belshe reiterated his view that the market capitalization of digital assets would grow in the future, stating *inter alia*:

> At Bitgo, we believe that digital assets are already fundamentally reshaping the financial system and are going to continue to do so. The ongoing announcements and news from all major traditional firms from Fidelity to Morgan Stanley to SoFi demonstrate that this is true. Since Bitgo's inception, *we've been building for a future where all assets will be digital*.

58.     Later during the FY 2025 Earnings Call, Defendant Belshe minimized the risk that declining digital asset prices presented to BitGo's business and financial results, stating *inter alia*:

> [W]e scaled our business model support over 1,700 assets across thousands of institutions and over 1 million users.  Through these accomplishments, we've continued to differentiate Bitgo in the broader digital asset industry.  To start, we operate purely as infrastructure.  We do not manage exchanges.  We do not compete with our clients ***nor do we have the same kind of exposure to digital assets that retail platforms do***. . . .  It's also important to note that we didn't enter this industry during or because of a hype cycle.  ***We were built and battle tested through many market cycles***, fulfilling a growing and enduring need for our clients.

59.     During the question and answer portion of the FY 2025 Earnings Call, Brett Knoblauch of Cantor Fitzgerald & Co. asked Defendants about the apparent tension in their statements, stating *inter alia* "you guys said you guys are a bit different of a platform and business isn't entirely correlated to where digital asset prices are going, but then also alluded to the fact that lower digital asset prices will weigh on some of the segments."  In response, Defendant Belshe minimized the risk that declining asset prices posed to BitGo's business and financial prospects, stating *inter alia*:

> [I]n general, I don't want to sugarcoat it, right?  Like the asset prices being down, it affects everybody in the sector.  And I think we said during the IPO roadshow, I will say it again, like ***Bitgo has some amount of correlation to digital asset prices***, and you kind of see it in many aspects of our business.  ***We've got a few that are less correlated***.  One of them is stablecoins, of course.  Those are not directly correlated to the crypto prices.  The other one is trade volume, which ***we sell a lot of trade volume in up and down markets, those volumes will increase***.  So it's not a direct correlation to just the asset prices.  But of course, it is a direct correlation to what's going on in the space broadly.  Lastly, we do have subscription service . . . .  So it's a little bit less volatile than the digital asset prices.

60.     Later during the FY 2025 Earnings Call, Defendant Reginelli similarly minimized the impact of declining digital asset prices on BitGo's future performance, stating *inter alia*:

> [O]n the staking side, we did add a significant token. . . .  So that's also going to help improve margins.  And then as we continue to grow our overall customer base, we'll get incremental revenues from subscriptions and services.  The difficult part of the business right now from a revenue perspective because it's so tied to digital

asset prices is our staking product line.  ***But we still are very confident in that overall product line and expect that to continue to grow.  We'll grow adding new assets to the platform, more units***.  And hopefully, we see a recovery in prices.

61.    Also during the FY 2025 Earnings Call, when asked what "global catalyst" he "expect[ed] to be most meaningful" for BitGo, Defendant Belshe named digital asset prices, represented that BitGo's financial performance "indicates we're doing something right", and went on to say that the Company's total addressable market would see "huge growth" in the next two years, stating *inter alia*:

> There's a lot of questions about like digital asset prices.  One thing that we're trying to help describe and always open to feedback on this as well is how do you differentiate how the market performed versus how Bitgo performed.  ***Our assets under custody grew 16% during this year, irrespective of the asset price on the market.  So hopefully, that indicates we're doing something right.  It's not easy to add billions of dollars of new asset into custody.  And then where is that next thing going to come from?  Look, I think mostly, it's that the [total addressable market] is growing.***  So the regulatory unlock of 2025 started with just what was now legal in the U.S. to do.  The second unlock is the increase of participants in the space.  And so kind of back to that comment earlier about pretty much every traditional financial firm has a significant investment in digital assets going right now.  ***You've heard me say this before.  Larry Fink of BlackRock says every asset, every bond, every token is going to be digitized.  I think there's an increasing number of people that believe that.  We just had Paul Atkins this week also saying that within 2 years, everything is going to be digital.  So this is just a huge growth in the total addressable market for us.  And we think as an infrastructure provider, we will be able to serve those clients***, whether you're talking about self-custody, whether you're talking about custody, whether you're talking about financial services on top.

62.    The statements referenced in ¶¶ 57–61 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, the Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants understated the scope and severity of the risk that declining digital asset prices posed to Company's business and financial performance; (ii) consequently, Defendants' statements regarding, *inter alia*, BitGo's

18

financial performance and business prospects lacked a reasonable basis; and (iii) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and/or failed to state information required to be stated therein.

### The Truth Continues to Emerge

63. On May 13, 2026, BitGo filed with the SEC a quarterly report on Form 10-Q, reporting its financial results for the first quarter of 2026 and issued a press release announcing the same. Among other items, BitGo reported total revenue of $3.8 billion, representing a decline of 38.7% from the preceding quarter. BitGo stated that this figure "reflect[ed] a weaker crypto market environment, as well as lower digital asset sales revenue resulting from a shift in client activity from spot trading to derivative products", and asserting that because derivative revenue is recognized on a net basis, while spot trading revenue is recognized on a gross basis, "revenue comparisons to prior periods are not directly comparable." BitGo also reported a net loss of $60.7 million, compared to a net loss of $25.7 million in Q1 2025, stating that its Q1 2026 net loss "was primarily driven by non-cash mark-to-market impacts related to the Company's Bitcoin treasury, as well as elevated IPO-related stock-based compensation expense."

64. On this news, BitGo's stock price fell $2.05 per share, or 17.2%, to close at $9.86 on May 14, 2026.

65. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### Regulation S-K Item 105

66. Throughout the Class Period, BitGo's Offering Documents and periodic financial filings were required to disclose the adverse facts and circumstances detailed above under

19

applicable SEC rules and regulations. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required BitGo to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants failed to disclose, *inter alia*, the scope and severity of the risk that declining digital asset prices posed to Company's business and financial performance. Defendants' failure to disclose the foregoing issue violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

## SCIENTER ALLEGATIONS

67.     Defendants had both the motive and opportunity to commit fraud. ***During the Class Period, the Individual Defendants enriched themselves by selling 436,645 shares of BitGo common stock for over $7.3 million in proceeds.*** Defendant Belshe sold 141,645 shares of BitGo common stock, collecting proceeds of approximately $2.3 million; Defendant Reginelli sold 45,000 shares of BitGo common stock, collecting proceeds of $753,300; and Defendant Fang sold 250,000 shares of BitGo common stock, collecting proceeds of approximately $4.2 million. Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.

68.     Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who

20

purchased or otherwise acquired BitGo securities in its IPO or purchased BitGo securities thereafter in the stock market pursuant and/or traceable to the Company's Registration Statement issued in connection with the IPO and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

70.     The members of the Class are so numerous that joinder of all members is impracticable. Since the IPO, the Company's securities have actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BitGo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

72.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

73.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

21

- whether Defendants omitted and/or misrepresented material facts about the business, operations and management of BitGo;

- whether the Individual Defendants caused BitGo to issue false and misleading statements in the Offering Docuemnts;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of BitGo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

74.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

75.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76.     This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

77.     During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff

22

and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BitGo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire BitGo securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

78.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for BitGo securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BitGo's finances and business prospects.

79.    By virtue of their positions at BitGo, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act

23

Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

80. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of BitGo, the Exchange Act Individual Defendants had knowledge of the details of BitGo's internal affairs.

81. The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of BitGo. As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to BitGo's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of BitGo securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning BitGo's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired BitGo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

82. During the Class Period, BitGo securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading

24

statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of BitGo securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of BitGo securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of BitGo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

83.     By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**<u>COUNT II</u>**

**(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

85.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.    During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of BitGo, and conducted and participated, directly and indirectly, in the conduct of BitGo's business affairs.  Because of their senior positions, they knew the adverse non-public information about BitGo's misstatement of income and expenses and false financial statements.

87.    As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to BitGo's financial condition and results of operations, and to correct promptly any public statements issued by BitGo which had become materially false or misleading.

88.    Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which BitGo disseminated in the marketplace during the Class Period concerning BitGo's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause BitGo to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants, therefore, were "controlling persons" of BitGo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BitGo securities.

89.    Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of BitGo.  By reason of their senior management positions and/or being directors of BitGo, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, BitGo to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general

operations of BitGo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

90.    By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BitGo.

## COUNT III

**(Violations of Section 11 of the Securities Act Against All Defendants)**

91.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

92.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

93.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

94.    BitGo is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

95.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

96.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

97.    Plaintiff acquired BitGo shares pursuant and/or traceable to the Registration Statement for the IPO.

98.    Plaintiff and the Class have sustained damages.  The value of BitGo securities has declined substantially subsequent to and due to Defendants' violations.

27

## COUNT IV

### (Violations of Section 15 of the Securities Act Against the Individual Defendants)

99.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

100.    This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

101.    The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of BitGo within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause BitGo to engage in the acts described herein.

102.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

103.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 8, 2026

Respectfully submitted,

POMERANTZ LLP

/s/ Jeremy A. Lieberman
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1. I, Jacques Arsenault _____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against BitGo Holdings, Inc. ("BitGo") and authorize the filing of a comparable complaint on my behalf.

3. The BitGo securities that are the subject of the Complaint were not purchased or otherwise acquired at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of all persons and entities other than Defendants that purchased or otherwise acquired BitGo Class A common stock pursuant and/or traceable to the registration statement and related prospectus (the "Offering Documents") issued in connection with the Company's January 22, 2026 initial public offering (the "IPO"), including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. The attached sheet lists all of my transactions in BitGo securities pursuant and/or traceable to the Offering Documents issued in connection with the Company's January 22, 2026 IPO.

6. During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

**Executed** _5/26/2026_____
                            **(Date)**

                                                                    ┌─ **Signed by:**
                                                                    │
                                                      _____*Jacques Arsenault*_____
                                                                    └─ FDC4ADFA7CEF457...
                                                                    **(Signature)**

                                                      Jacques Arsenault
                                                      _____
                                                            **(Type or Print Name)**

**BitGo Holdings, Inc. (BTGO)**                                                              **Jacques Arsenault**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 1/22/2026 | 75 | $22.9899 |
| Sale | 5/11/2026 | (75) | $12.6001 |